GRODSKY & OLECKI LLP
Allen B. Grodsky (SBN 111064)
*allen@thegolawfirm.com*
Courtney L. Puritsky (SBN 251330)
*courtney@thegolawfirm.com*
Tim B. Henderson (SBN 281159)
*tim@thegolawfirm.com*
2001 Wilshire Boulevard, Suite 210
Santa Monica, California 90403
Telephone:  (310) 315-3009
Facsimile: (310) 315-1557

Attorneys for Defendants Skybound Productions,
Inc., Circle of Confusion Productions, LLC,
New Circle of Confusion Productions, Inc.,
Robert Kirkman, LLC, Robert Kirkman, and
David Alpert

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MELVIN WILLIAM SMITH, JR., a/k/a MEL SMITH, an individual,<br><br>Plaintiff,<br><br>v.<br><br>AMC NETWORKS, INC., a Delaware corporation; AMC FILM HOLDINGS, LLC, a Delaware limited liability company; et al.,<br><br>Defendants. | Case No.  5:18-cv-03803-LHK<br><br>Hon. Lucy H. Koh<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULE 12(b)(6) BY DEFENDANTS SKYBOUND PRODUCTIONS, INC., CIRCLE OF CONFUSION PRODUCTIONS, LLC, NEW CIRCLE OF CONFUSION PRODUCTIONS, INC., ROBERT KIRKMAN, LLC, ROBERT KIRKMAN, AND DAVID ALPERT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      Jan. 17, 2019<br>Time:     1:30 p.m.<br>Div.:       San Jose<br>Place:     Courtroom 8 |

**TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 17, 2019, at 1:30 p.m., or as soon thereafter as the parties may be heard in the Courtroom of the Honorable Lucy H. Koh, United States District Judge for the Northern District of California, located in the San Jose Courthouse, Courtroom 8, 280 South First St., San Jose, California 95113, Defendants Skybound Productions, Inc., Circle of Confusion Productions, LLC, New Circle of Confusion Productions, Inc., Robert Kirkman, LLC, Robert Kirkman, and David Alpert (the "Skybound Defendants") will and hereby do move to dismiss the copyright infringement and breach of fiduciary duty claims alleged in the Second Amended Complaint ("SAC") of Plaintiff Melvin William Smith, Jr. a/k/a Mel Smith ("Plaintiff"), with prejudice, under Fed. R. Civ. P. Rule 12(b)(6) on the grounds that the First Claim for Copyright Infringement and Second Claim for Breach of Fiduciary Duty fail to state a claim for relief against the Skybound Defendants and the pleading deficiencies cannot be cured by amendment.

This Motion is based upon this Notice and the attached Memorandum of Points and Authorities; the proposed Order; exhibits submitted with the motion to dismiss the SAC filed by Defendants AMC Networks, Inc., AMC Film Holdings LLC, AMC Network Entertainment LLC, AMC TV Studios LLC, and Valhalla Entertainment, Inc.; all pleadings and papers on file in this action; any matters of which the Court may take judicial notice; and such other argument, evidence and additional matters that may be presented to this Court at or before the hearing on this Motion.

Dated:  November 2, 2018

GRODSKY & OLECKI LLP
Allen B. Grodsky
Courtney L. Puritsky
Tim B. Henderson

By:  _____/s/ Tim B. Henderson_____
          Tim B. Henderson

Attorneys for Defendants Skybound Productions, Inc., Circle of Confusion Productions, LLC, New Circle of Confusion Productions, Inc., Robert Kirkman, LLC, Robert Kirkman, and David Alpert

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE WORKS AT ISSUE ARE PROPERLY
      BEFORE THE COURT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   Dead Ahead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.   Fear the Walking Dead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  THE COPYRIGHT INFRINGEMENT CLAIM SHOULD
      BE DISMISSED BECAUSE THE WORKS ARE NOT
      SUBSTANTIALLY SIMILAR IN
      COPYRIGHT-PROTECTED EXPRESSION  . . . . . . . . . . . . . . . . . . . . . . . 5

      A.   The Elements of a Copyright Infringement Claim . . . . . . . . . . . . . . . . 5

      B.   Dead Ahead and Fear the Walking Dead Are Not
           Substantially Similar in Expression as a Matter of Law . . . . . . . . . . . . . 6

           1.   The Plots and Sequences of Events Are Entirely
                Dissimilar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           2.   The Stock Characters in Dead Ahead Are Not
                Protectable and, in Any Event, Are Completely Different . . . . . . 11

           3.   The Settings of the Works Are Divergent  . . . . . . . . . . . . . . . . . . 15

           4.   The Supposedly Similar Themes Are Too Generic
                to Be Protectable and Dead Ahead Lacks Several
                Themes in Fear the Walking Dead . . . . . . . . . . . . . . . . . . . . . . . 17

           5.   The Moods of the Works Are Materially Different . . . . . . . . . . . 18

           6.   Dialogue Similarities Do Not Exist  . . . . . . . . . . . . . . . . . . . . . . 18

           7.   The Pacing of the Two Works Is Not Substantially Similar  . . . . 19

           8.   Summary of Extrinsic Test Factors  . . . . . . . . . . . . . . . . . . . . . . 19

IV.   THE BREACH OF FIDUCIARY DUTY CLAIM ALSO
      FAILS AS A MATTER OF LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Alexander v. Murdoch*,
   2011 WL 2802923 (S.D.N.Y. July 14, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Campbell v. Walt Disney Co.*,
   718 F. Supp. 2d 1108 (N.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . 2, 17, 19

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

*Funky Films, Inc. v. Time Warner Ent't Co.*,
   462 F.3d 1072 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Hogan v. DC Comics*,
   48 F. Supp. 2d 298 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kouf v. Walt Disney Pictures & Telev.*,
   16 F.3d 1042 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Marcus v. ABC Signature Studios, Inc.*,
   279 F. Supp. 3d 1056 (C.D. Cal. 2017) . . . . . . . . . . . . . . . . . . . . . . . . 5, 16, 17

*Olson v. Nat'l Broadcasting Co., Inc.*,
   855 F.2d 1446 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18, 19

*Wild v. NBC Universal, Inc.*,
   788 F. Supp. 2d 1083 (C.D. Cal. 2011), *aff'd* 2013 WL 750655
   (9th Cir. Feb. 23, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 13, 15

*Zella v. E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 18

**RULES**

Fed. R. Civ. Proc. Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         At the heart of Plaintiff's copyright claim is his unfounded belief that his

4    copyright in the comic book *Dead Ahead* prevents anyone else from telling a story

5    about zombies and "the high seas."  It is hornbook law that ideas like Plaintiff's are not

6    copyrightable.  In an attempt to avoid this fatal flaw, the Second Amended Complaint

7    ("SAC") – Plaintiff's third attempt to state a valid copyright claim – offers a laundry

8    list of supposed similarities between the two works.  But even a cursory review of the

9    key moments hand-picked *by Plaintiff* discloses that the protectable elements of the

10   works differ in every meaningful respect.

11        *Dead Ahead* is a horror story, told from a first-person perspective, that almost

12   entirely revolves around a fishing boat captain and his customers' attempts to survive a

13   zombie apocalypse by boarding a cruise ship in search of supplies while beset by

14   zombies at every turn.  There is little to no character development, the most that is

15   known about almost all the characters is their name – the depiction of one character

16   even changes partway through the story.  The zombie apocalypse is depicted through

17   grotesque and fantastical illustrations and described by the protagonist in melodramatic

18   and poetic diary entries.

19        In contrast, Season 2 of *Fear the Walking Dead* is a character-driven, realistic

20   portrayal (well, as realistic as possible when zombies are involved) of the histories,

21   flaws, and relationships of its characters as they continue to deal with the zombie

22   apocalypse that began in Season 1.  Over the course of Season 2, *Fear the Walking*

23   *Dead*'s characters endure numerous wrenching scenarios that test, and sometimes

24   break, their bonds and wills, such as failing to save a family bound by a suicide pact,

25   destroying a countryside estate where zombies are kept in the basement, nearly dying

26   from dehydration, dogs, and outlaws while traversing the Sonoran desert, joining a

27   spiritual community of survivors in Tijuana, and murdering other survivors.  In *Fear*

28   *the Walking Dead*, although the threat of zombies is ever-present, the drama is driven

by the human characters and often the humans are more dangerous than the zombies.

While Plaintiff may honestly believe that his story has been copied, *Fear the Walking Dead* and *Dead Ahead* are not "substantially similar" in any material respect. Thus, the copyright infringement claim should be dismissed with prejudice and without leave to amend.  As a result, the breach of fiduciary duty claim must fail as well because it is based on the alleged copying, which did not occur as a matter of law.

## II.    THE WORKS AT ISSUE ARE PROPERLY BEFORE THE COURT

In connection with their own motion to dismiss, Defendants AMC Networks, Inc., AMC Film Holdings LLC, AMC Network Entertainment LLC, AMC TV Studios LLC, and Valhalla Entertainment, Inc. (the "AMC Defendants") submitted copies of the works at issue, the graphic novel *Dead Ahead* (a consolidated version of the three original issues of *Dead Ahead*, plus 14 pages of additional material, per SAC ¶ 21) and DVDs containing Season 2 of the television series *Fear the Walking Dead*.  In the interest of avoiding duplicative exhibits, references below are to the exhibits provided by the AMC Defendants and attached to the declaration of Megan Lollar.

Both works are properly before the court, and supersede the written allegations of a plaintiff's pleading, under the doctrine of incorporation by reference because they are referenced repeatedly throughout the SAC.  *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005) ("incorporation by reference" doctrine permitted court to consider webpage referenced in complaint in ruling on motion to dismiss).  The works themselves may be considered in ruling on a Rule 12(b)(6) motion.  *See, e.g.*, *Wild v. NBC Universal, Inc.*, 788 F. Supp. 2d 1083, 1090 n.1 (C.D. Cal. 2011), *aff'd* 2013 WL 750655 (9th Cir. Feb. 23, 2013) (taking judicial notice of comic book and television series and granting motion to dismiss); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1131, n.6 (C.D. Cal. 2007) (citation omitted) (dismissal following comparison of treatment and television show); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1111 n.3 (N.D. Cal. 2010) (dismissal based on comparison of screenplay and motion picture).

1  A brief synopsis of each work follows.

2  **A.   Dead Ahead**

3  *Dead Ahead* is a classic horror story told from the perspective of Captain Jack,

4  the operator of a sport fishing boat in Mexico who is out at sea when a zombie

5  apocalypse begins.  The story is told through Captain Jack's verbose and melodramatic

6  diary entries and inner monologue and shown through the graphic and almost

7  psychedelic illustrations of the non-stop onslaught of zombies.  The images are the

8  focus of the story.  Although the characters are named, not much is known about them

9  besides that they went on a fishing trip and are trying to survive a zombie apocalypse.

10  The first third of *Dead Ahead* largely concerns Captain Jack and his customers

11  adjusting to the new zombie apocalypse, making runs to land for supplies while

12  fighting off zombies, and dealing with a severe storm.  Ex. 4 to Declaration of Megan

13  Lollar submitted in support of the AMC Defendants' Motion to Dismiss, pp. 1-36.[1/]

14  The final two-thirds of the comic revolve around Captain Jack's attempt to take over a

15  cruise ship that becomes overrun by zombies.  Ex. 4, pp. 37-82.  A crew of pirates is

16  also attempting to take over the cruise ship, but they do not seem to ever meet Captain

17  Jack or his group.  The story ends when Captain Jack apparently blows up the cruise

18  ship.

19  **B.   Fear the Walking Dead**

20  Although it includes one fictional and fantastical aspect (zombies), *Fear the*

21  *Walking Dead* is a modern, character-driven story told from an omniscient perspective.

22  In Season 1 of *Fear the Walking Dead*, the characters fight through riots, military

23  quarantines, and a growing zombie outbreak in Los Angeles.    By the end of Season

24  1, the survivors have fought their way to a beach side mansion, and Season 2 picks up

25  on a Los Angeles beach where the survivors board a large, technologically-advanced

26  luxury yacht, the Abigail.

27

28  [1/]    Citations to the graphic novel are based on counting from the first page of action immediately following the introduction.

Although thrown together in part by circumstance, the main characters share close relationships that heighten the dramatic moments they encounter.  The main characters are Madison Clark, her son Nick, her daughter Alicia, her fiancee Travis Manawa, and his son Chris Manawa, as well as Daniel Salazar, his daughter Ofelia, and Victor Strand, the owner of the yacht.  These characters' relationships stretch back well before they reached the yacht.  For example, in Season 1 the Salazar family gave Madison and Travis' family shelter during a riot, Strand and Nick helped each other survive and escape after being detained by the military, and Strand took the group to his mansion on the beach.

In Season 2, after leaving Los Angeles, the characters confront a variety of challenging situations, sometimes coming together to defeat common enemies (both zombie and human) and other times splintering apart.  For example, although Madison, Daniel, and others work together to defeat threatening interlopers who take over the yacht and capture Travis and Alicia, Travis is ultimately unable to save his son Chris, whose inability to cope with the death of his mother and the depravity of the zombie apocalypse drives him to murder.  These challenging situations take the characters to a variety of locales, including an island inhabited by a family bound by a suicide pact, beaches strewn with the wreckage of an airplane crash, a lush but sinister estate in the Mexican countryside, the Sonoran desert, a fortified neighborhood in Tijuana where a mysterious pharmacist also acts as its spiritual leader, and a beach side hotel teeming with zombies and other survivors.

After 15 episodes, the characters find themselves very far from where they started.  Madison, Travis, and Alicia are expelled from the hotel because they killed other survivors while Strand elects to stay behind, Nick flees Tijuana and heads for the border with his new love interest, Ofelia abandons the group, Daniel apparently perished in a fire, and Chris is murdered by other survivors.

III.   **THE COPYRIGHT INFRINGEMENT CLAIM SHOULD BE DISMISSED BECAUSE THE WORKS ARE NOT SUBSTANTIALLY SIMILAR IN COPYRIGHT-PROTECTED EXPRESSION**

A.   **The Elements of a Copyright Infringement Claim**

To plead copyright infringement, a plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  The second "copying" prong has two distinct elements – that "the infringer had access to plaintiff's copyrighted work and that the works at issue are substantially similar in their protected elements." *Wild*, 788 F. Supp. 2d at 1097-98 (citation omitted).[2]

In the Ninth Circuit, substantial similarity of literary and motion picture works is evaluated under an "extrinsic test" that analyzes the "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" of each work.  *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citations omitted).  The test can be satisfied only by similarities in "the actual concrete elements that make up the total sequence of events and relationships between the major characters . . . ." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).  "[S]tock scenes, general plot ideas, and scenes-a-faire (situations and incidents that flow naturally from a basic plot premise) are not protected." *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1065 (C.D. Cal. 2017) (citation omitted).  Thus, lists of general plot ideas, character types, stock elements, and scenes-a-faire are not sufficient to satisfy the extrinsic test.  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (such lists "are inherently subjective and unreliable"); *accord Kouf v. Walt Disney Pictures & Telev.*, 16 F.3d 1042, 1045-46 (9th Cir. 1994).

The extrinsic test "may often be decided as a matter of law" (*Funky Films*, 462

---

[2]   For purposes of this Motion only, the Skybound Defendants do not address the issue of access.  However, "[n]o amount of proof of access will suffice to show copying if there are no similarities." *Funky Films, Inc. v. Time Warner Ent't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citation omitted).

F.3d at 1076), and a court may dismiss a plaintiff's complaint under Rule 12(b)(6) if a complaint's allegations of "substantial similarity" are belied by the works at issue. *See, e.g., Zella*, 529 F. Supp. 2d at 1131 (citation omitted).

**B.**   **Dead Ahead and Fear the Walking Dead Are Not Substantially Similar in Expression as a Matter of Law**

None of the "substantial similarity" factors favor Plaintiff.

**1.**   **The Plots and Sequences of Events Are Entirely Dissimilar**

Plaintiff contends that *Dead Ahead* and *Fear the Walking Dead* are similar because they share an overarching premise and some specific events supposedly occur in both works. A review of these supposed similarities actually discloses numerous meaningful differences.

Plaintiff's main claim of similarity is that both works share an identical premise, namely "that a ragtag group of individuals thrown together by circumstance escape a zombie apocalypse from Southern California by fleeing to the Pacific Ocean on board a boat heading south toward Mexico." (SAC ¶ 41.) Numerous problems with this contention are immediately apparent. For starters, this general premise is not a protectable expression because "[n]o one can own the basic idea for a story." *Zella*, 529 F. Supp. 2d at 1133-34 ("General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind.") (citations omitted); *Litchfield*, 736 F.2d at 1357 ("Any similarities in plot exist only at the general level for which plaintiff cannot claim copyright protection.").

But even if such a broad premise were protectable, Plaintiff is incorrect that this idea encapsulates both works. The main characters in *Fear the Walking Dead* flee Los Angeles by boarding a boat (Ex. 5, ep. 1), but the survivors in *Dead Ahead* are already on board a boat when there are reports of a zombie attack (Ex. 4, p. 1). The survivors in *Fear the Walking Dead* are fleeing from Los Angeles and originally plan to go to San Diego (Ex. 5, ep. 1), but in *Dead Ahead* the boat's home port is in Mexico (Ex. 4, p. 6).

6

1    Plaintiff's supposed "identical premise" also vastly oversimplifies *Fear the*

2  *Walking Dead*.  In contrast to *Dead Ahead*, a first-person narrated horror story that

3  largely involves a search for supplies on a cruise ship, *Fear the Walking Dead* weaves

4  together numerous narratives about flawed characters whose lives and motivations are

5  constantly shifting in response to the complicated new world in which they live and the

6  people they meet.  These storylines began in Season 1, when several plot points

7  occurred that have no parallel in *Dead Ahead*, for example, Daniel Salazar and his

8  family shelter Madison and Travis' family, Madison searches for oxycodone to treat

9  Nick's heroin withdrawals, and Nick and Strand are captured and detained by the

10  military.  Season 2 of *Fear the Walking Dead* also has numerous plot lines with no

11  parallel in *Dead Ahead*.[3/]  Thus, even at the most general level, the plots of the two

12  works are significantly different.

13    Plaintiff also points to several specific events or sequences that he contends are

14  substantially similar.  Many of these events are unprotectable scenes-a-faire and, again,

15  there are notable differences even in these specific events hand selected by Plaintiff.

16  First, the SAC is incorrect when it alleges that the survivors in both works "believe

17  they can avoid zombies at sea and they are anxious (at first) to evade military ships."

18  (SAC ¶ 41.)  In *Fear the Walking Dead*, the main characters do head to a yacht to

19  escape zombie-ridden Los Angeles and are wary of the authorities as a result of events

20  occurring during Season 1 (Ex. 5, ep. 1), but in *Dead Ahead*, Captain Jack's first

21  ────────────────

22  [3/]    These other plot points include: the survivors visit Catrina Island where a family

23  has created a gated fortress to keep out zombies but they have a suicide pact (Ex. 5, Ep. 2); Nick realizes that he can camouflage himself by smearing zombie blood on himself

24  and walks amongst the zombies (Ep. 3); the main characters encounter an airplane

25  wreck with survivors and zombies but Strand heartlessly refuses to save the survivors (Ep. 3); interlopers take over the yacht under the pretense that they need help for a

26  pregnant woman (Ep. 4); several survivors go to an estate in the Mexican countryside owned by Strand's former lover who has been infected by zombies (Eps. 6-7); Travis,

27  concerned about Chris' increasing propensity for violence, unsuccessfully tries to keep

28  him from harming others (Ep. 7); Nick joins a community of survivors in Tijuana led by a charismatic pharmacist with a dark secret (Eps. 8-9); and some of the survivors

attempt to return to the yacht but it has been stolen (Ep. 9).

reaction to news of the zombie outbreak is to head back to land where he asks the Mexican navy for help (Ex. 4, pp. 4-6).

Second, Plaintiff claims a similarity because the "characters consult a map and chart their course" and "use that scene as a narrative device" to explain that they are "trapped on a seafaring vessel." (SAC ¶ 41.) Looking at a map while on a boat and discussing the general plot of being stuck on a boat are unprotectable scenes-a-fair and just part and parcel of the idea of a zombie apocalypse with characters on a boat. In any event, in *Fear the Walking Dead*, the characters look at a map to try to find a way to avoid another ship that is following them (Ex. 5, ep. 2), a plot point missing in *Dead Ahead*. Similarly, "fishing, communicating via HAM radio, and surveying the sea from time to time" (SAC ¶ 41) are common nautical scenes-a-faire and the expressions differ in both works. For example, in *Fear the Walking Dead*, one of the pirates uses a radio to befriend Alicia and locate the yacht's location (Ex. 5, eps. 1, 4), but in *Dead Ahead* the radio relays news of zombies running amok in Ensenada (Ex. 4, p. 3). Even these simple sequences betray the marked differences between the works.

Third, contrary to Plaintiff's assertions, there are significant differences in the "concerted military action against civilians along the California coast" in both works. (SAC ¶ 41.) Military action was a prominent feature in Season 1 of *Fear the Walking Dead*, well before the characters ever made it to the yacht, and a run in with the Mexican navy in Season 2 ends in the violent death of Luis, a minor character (Ex. 5, ep. 6). In contrast, in *Dead Ahead*, the only appearance of the military is the Mexican navy's helpful instruction to turn the fishing boat back to sea (Ex. 4, p. 6). There are no other interactions with the military in *Dead Ahead* but only secondhand rumors of military actions over the radio. (Ex. 4, pp. 37-38) (The picture on page 12 of the SAC showing a city burning may not have occurred at all because it is actually a picture of Captain Jack's dreams.)

Fourth, Plaintiff claims similarity because a propeller is used to kill zombies. (SAC ¶ 41.) Setting aside that this is not a particularly surprising or original idea

given the general plot of zombies and boats, the expression is significantly different. In *Fear the Walking Dead*, Nick uses the propeller of a small zodiac boat at the very start of the story to kill a single zombie and allow the survivors to reach the larger yacht. (Ex. 5, ep. 1.)  In *Dead Ahead*, it is not clear from the picture in the SAC on page 15 if the propeller of the fishing boat is used to kill any zombies because there is a long trail of zombies in the boat's wake.

Fifth, Plaintiff alleges that both works involve characters looking for supplies at abandoned resorts that have a pier but find zombies at the hotels and lose their boats. (SAC ¶ 41.)  As a preliminary matter, it is not clear that the characters in *Dead Ahead* ever make it to a resort.  There is reference to a resort being on the opposite side of an island where the survivors search for supplies, but upon arriving at the island, the survivors walk through a decimated beach-side town, not a resort.  (Ex. 4, pp. 15-17.) Even assuming it is a resort, the sequences of events are distinct.  In *Dead Ahead*, the fishing boat drifts to the island after a storm and Captain Jack takes three others with him to look for supplies, they are attacked by zombies, and acquire a new larger tug boat to escape.  (Ex. 4, pp. 15-25.)  The survivors in *Fear the Walking Dead* do not make it to the beach resort until the end of the season after several other plot points that have no parallel in *Dead Ahead*. (Ex. 5, ep. 9; *see, e.g.*, footnote 3, *supra*.)

The SAC also alleges that "many of the events transpiring on the cruise ship are virtually identical to the events transpiring at the resort hotel and on the yacht" in *Fear the Walking Dead*.  Several differences are noteworthy:

- it is not clear that the survivors on board the cruise ship ever even see the pirates in *Dead Ahead* (SAC ¶ 41);
- the pirates in *Dead Ahead* are trying to find supplies on the cruise ship, just like the survivors  (Ex. 4, p. 48), but in *Fear the Walking Dead*, the pirates are attempting to capture the yacht and hostages (Ex. 5, ep. 4);
- unlike Captain Jack's race to the engine room to start the cruise ship while fighting off zombies in *Dead Ahead* (Ex. 4, pp. 78-80), there are no

9

zombie attacks when Travis Manawa takes hours trying to hot-wire the yacht to appease the pirates who have taken them hostage (Ex. 5, ep. 4);

• zombie hordes are let loose in *Dead Ahead* when the pirates open a door holding them back (Ex. 4, p. 54), but in *Fear the Walking Dead*, Madison and Strand attract the zombies by getting drunk at the hotel bar and playing the piano (Ex. 5, ep. 9);

• in *Fear the Walking Dead*, the main characters come into repeated conflicts with the other group of survivors at the hotel and are forced to escape after Travis accidentally kills their leader (Ex. 5, eps. 14-15), but in *Dead Ahead* Captain Jack works together with the survivors on the cruise ship (Ex. 4, pp. 65-66).

Several other supposed similarities are difficult to identify because it is not clear to what Plaintiff is referring.  For example, the SAC alleges that in *Fear the Walking Dead*, Strand "sets the Abigail on fire in an attempt to destroy the zombies" and that "pirates seize the yacht before it is wrecked by the main characters who endeavor to kill the zombies who are aboard."  (SAC ¶ 41.)  The Abigail was lost, presumably stolen by the Mexican navy.[4]  (Ex. 5, ep. 9.)  The SAC also alleges both works feature an elevator, but it is not clear that Captain Jack ever makes it into an elevator or if he just waits out in front of one for it to come.  (Ex. 4, p. 61-63.)

Thus, copyright does not protect the general plot of "zombies on the high seas" and the events that are supposedly similar actually disclose that there are meaningful differences between the two works.

---

[4]    Far into Season 3 – not Season 2 – of *Fear the Walking Dead*, Strand discovers the Abigail has run aground, no longer works, and it has been overrun by zombies. While there, Strand talks over the radio with someone claiming to be a Russian cosmonaut and then takes supplies before burning the boat.  This sequence is nothing like *Dead Ahead*, when Captain Jack first discovers the tug boat and steals it after killing the one zombie on board.  (Ex. 4, pp. 21-24.)

2.      **The Stock Characters in Dead Ahead Are Not Protectable and, in Any Event, Are Completely Different**

Comparing characters is nearly impossible because the reader learns next to nothing about the characters in *Dead Ahead* beyond their name, that they went on a fishing trip, and they are trying to survive a zombie apocalypse.  For example, according to the SAC, one of the main characters in *Dead Ahead* is Emile, who is identified in the SAC as the character who speaks both English and Spanish.  (SAC ¶ 42.)  But the Emile character is so stock and devoid of recognizable features that his depiction is inconsistent.  For example, on page 32, Emile is a young, clean shaven Caucasian man with a thin face and light brown curly hair, but on page 44, Emile is a gaunt older man with darker skin, a bandana, and a mustache.  Because of their lack of specificity, the characters in *Dead Ahead* are not entitled to copyright protection. *Olson v. Nat'l Broadcasting Co., Inc.*, 855 F.2d 1446, 1452 (9th Cir. 1988) ("[T]he less developed the characters, the less they can be copyrighted") (citations omitted); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) ("A stock character or basic character type, however, is not entitled to copyright protection.") (citation omitted).

*Fear the Walking Dead* takes a completely opposite approach, exhaustively exploring the characters, their backstories, and their motivations.  One way in which *Fear the Walking Dead* does this is through flashbacks to before the apocalypse, a feature that is missing from *Dead Ahead* (aside from a brief flashback showing the characters fishing at the start of the apocalypse).  In the *Fear the Walking Dead* flashbacks, the viewer learns a lot about the characters and what made them who they are, including about Nick and Madison's difficult relationship due to Nick's drug abuse (Ep. 8), how Victor Strand fell in love with Thomas Abigail (the owner of the estate and namesake of the yacht) (Ep. 4), and Daniel Salazar's violent past in El Salvador (Ep. 7).  The characters in *Dead Ahead* do not have any back stories, let alone substantially similar ones.

Given the vast difference in how the works treat their characters, it is not surprising that none of the character similarities alleged by Plaintiff actually bear out upon closer inspection.  First, the SAC alleges that both works follow the story of "eight characters, four men and four women, on board their respective vessels struggling to survive a post-apocalyptic world on water."  (SAC ¶ 42.)  Generic characteristics, such as the gender and number of characters and the situation they find themselves in, are not specific enough to garner copyright protection.[5]

Second, the SAC alleges that in both works the "central protagonist is a male educator," referring to Captain Jack in *Dead Ahead* and Travis Manawa in *Fear the Walking Dead*.  (SAC ¶ 42.)  Even were this general character trait sufficient to warrant protection (it is not), Plaintiff's supposed similarity misses the mark on several fronts:

- Captain Jack is the operator of a sport fishing boat, not an educator;[6]
- Travis Manawa, a stocky curly haired man bears little to no resemblance to Captain Jack's ruddy, gaunt, and long-haired appearance;
- if any character were the central protagonist at the start of Season 2 it is not Travis but Victor Strand, the owner of the yacht and a gay African American businessman who ruthlessly refuses to help outsiders, a stark contrast to Captain Jack, who appears to sacrifice himself at the end of *Dead Ahead*.

Third, the SAC's allegation that both works "feature a mysterious, red-headed, female, rifle-sporting character of around the same age named Red, both of whom have

---

[5]  For what it is worth, it is not clear that there are "four male and four female survivors" in *Dead Ahead* because at least seven survivors are given male names (Captain Jack, Emile, Chapman, Tony, Patrick, Mark, and Jim).

[6]  To the extent that Plaintiff's description of Captain Jack as an educator is based on a preliminary description of *Dead Ahead* characters allegedly conveyed to Defendant David Alpert (*see* SAC ¶ 25), that description cannot form the basis of an infringement claim because Plaintiff does not allege that he has registered a copyright in those notes.  *Feist*, 499 U.S. at 361.

fringe bangs and carry similar rifles with the exact same scope" is a massive overreach. (SAC ¶ 42.)  For starters, calling a red-headed character "Red" and carrying a gun during a zombie apocalypse are features so generic that they cannot be considered protectable.  Similarly, the visual images on page 17 in the SAC of looking through "a telescopic rifle sight [are] a very commonplace element found in many works."  *Wild*, 788 F. Supp. 2d at 1105.  Furthermore, "Red" is not "feature[d]" in *Fear the Walking Dead*.  (SAC ¶ 42.)  She barely appears, standing quietly in the background for approximately three minutes before being shot and killed halfway through her one and only line.  (Ex. 5, ep. 4.)  Despite her short appearance, there are still meaningful differences between the two "Red" characters.  In *Fear the Walking Dead*, "Red" is a threatening interloper who boards the yacht and has long straight hair, while the "Red" in *Dead Ahead* is one of the survivors on Captain Jack's boat, not a pirate, and has short curly hair.  (Ex. 4, p. 5.)  The characters are not similar in any protectable respect.

Fourth, the SAC alleges that "[b]oth works feature a Central-American crew member with a military background whose dialogue is a mixture of English and Spanish and who sports a goatee and carries a pistol . . . ."  (SAC ¶ 42.)  As shown above, the Emile character is so generic that his depiction changes throughout *Dead Ahead*.  Additionally, having a character speaking in a mixture of English and Spanish flows naturally from the premise of telling a story in English about characters in Southern California or Mexico.

Finally, the SAC alleges that there are pirates in both works.  (SAC ¶ 42.)  The idea of pirates in a story that takes place on the ocean is not protectable, and the expression of pirates is different in both works.  In *Dead Ahead*, the pirates are a haggard group of apparently former military members who try to take over a cruise ship because they believe it carries supplies.  (Ex. 4, p. 48.)  The pirates in *Dead Ahead* never try to board the tugboat and it is not clear that the pirates and survivors ever even meet.  In *Fear the Walking Dead*, the "pirates" are far more cunning.  One of the

"pirates" strikes up a conversation with Alicia and tricks her into giving up the location of the yacht.  When the "pirates" locate the yacht, they appear to be three young well-dressed people who create the ruse of needing help for a pregnant woman to board the yacht and take the main characters hostage.  (Ex. 5, ep. 4.)

Further confirming the lack of character overlap, there are numerous ***main*** characters (let alone minor characters) in *Fear the Walking Dead* for which there is no parallel in *Dead Ahead*, including:

- Madison Clark: fiancée of Travis Manawa, mother of Nick and Alicia, a headstrong, take-charge protector struggling to keep her blended family together;

- Nicolas Clark: son of Madison and brother of Alicia Clark, a drug addict struggling with his recovery who has a penchant for smearing zombie blood on himself and walking amongst the living dead;

- Alicia Clark: daughter of Madison and sister of Nicolas Clark, a naïve teenager whose eagerness to help places the entire group at risk;

- Victor Strand: a former businessman who rescues the other survivors by taking them to his yacht and who is forced to kill his longtime boyfriend who has become infected;

- Chris Manawa: son of Travis, a troubled teenager who has difficulty dealing with the zombie apocalypse and the loss of his mother and begins to act out in threatening and violent ways towards other survivors;

- Ofelia Salazar: daughter of Daniel Salazar, devoted to her father but who abandons the other survivors and heads for America.[7]

Therefore, both works treat their characters in entirely divergent ways and there are no substantial similarities between any of the characters.  This is persuasive evidence that the works are not substantially similar.  *Wild,* 788 F. Supp. 2d at 1109

_____

[7]   As can be seen from the above list, many of the characters on *Fear the Walking Dead* are close family members, a feature completely absent in *Dead Ahead*.

1  ("The almost complete lack of parallel characters strongly suggests, without any

2  further analysis, that the works lack substantial similarity.") (citations omitted).

3            **3.      The Settings of the Works Are Divergent**

4        The settings of the works are not similar in any protectable respect and the

5  SAC's broad claims of similarity are readily disproven.

6        The SAC first claims similarity because a "significant part of the two works

7  takes place on mid-size vessels."  (SAC ¶ 44(a).)  This vague idea is unprotectable and,

8  in any event, the two boats could not be more different.  In *Dead Ahead*, the survivors

9  are first on a small sport fishing boat and later steal a larger, industrial tug boat.  (Ex.

10  4, pp. 25-26.)  In contrast, in *Fear the Walking Dead*, the survivors flee on the Abigail,

11  Strand's technologically-advanced and well-appointed mega-yacht.  (Ex. 5, ep. 1.)

12        Plaintiff also claims a similar nautical setting based on allegedly similar pictures

13  of the respective boats on the water by comparing a picture in *Dead Ahead* and

14  "advertising and promotional material" for *Fear the Walking Dead*.  (SAC ¶ 32.)  A

15  picture of a boat on the water is not protectable and there are notable differences in the

16  two images.  In *Dead Ahead*, the nighttime image shows the boat close to the

17  foreground and in rough shape, and the moon appears to actually be a skull with bats

18  or birds flying out of it.  In contrast, in *Fear the Walking Dead*, the daytime image

19  shows the luxury yacht off in the distance and directly above it the sun has been

20  blocked by clouds, leaving the impression of a skull.  The *Fear the Walking Dead*

21  image is thus suggestive and evocative, implying the danger the characters are facing,

22  while the *Dead Ahead* image is grotesque and far more literal.

23        The SAC also contends that there is a similar geographic setting, claiming that

24  both stories take place "on the high seas" with boats "travelling [sic] south from the

25  Southern California coast toward South America," and that both "start[] at the same

26  place and take[] place in the same part of the ocean."  (SAC ¶ 44(a).)  Even if true,

27  such a similarity would not be protectable.  *See Marcus*, 279 F. Supp. 3d at 1071

28  (citing *Alexander v. Murdoch*, 2011 WL 2802923, at *7, 2011 U.S. Dist. LEXIS

79503, at *21 (S.D.N.Y. July 14, 2011) (finding that the shared setting of Los Angeles was not protectable under copyright law).

But there are differences in the geographic setting.  In *Fear the Walking Dead*, the survivors escape from a beach in Los Angeles, board Strand's yacht, and plan to head to San Diego and eventually go to Mexico, not South America.  (Ex. 5, eps. 1-3, 6.)  In *Dead Ahead*, the fishing boat's home port is in Mexico, not Southern California, and a map in *Dead Ahead* states that the survivors traveled much further south than the yacht in *Fear the Walking Dead*, reaching points at least as far away as Peru.  (Ex. 4, pp. 6, 27-28.)

The SAC next alleges that the boats make similar stops to search for supplies but this too misses the mark.  (SAC ¶ 44(a).)  Stopping for supplies is a natural result of the basic premise of trying to survive the apocalypse and the settings where the survivors stop for supplies are markedly different.  For example, in *Fear the Walking Dead*, the survivors stop at Catrina Island where a family of survivors has created a fenced in area to keep out zombies.  (Ex. 5, ep. 2.)  There is nothing similar in *Dead Ahead*.  The SAC tries to mask this problem by alleging that both works have settings on "sandy knolls and dunes that emerge form the Pacific Ocean," but it is hardly surprising that survivors on a boat would occasionally find themselves on beaches.  (SAC ¶ 44(a).)  And again there are key differences.  In *Dead Ahead* the survivors appear to just look at the beach through binoculars from afar (Ex. 4, p. 5), but in *Fear the Walking Dead* the survivors go to a beach that is littered with supplies from an airplane crash (Ex. 5, ep. 3).

Finally, the SAC alleges that "elevators and engine rooms are used as places of refuge and tension in both works."  (SAC ¶ 44(a).)  It is not clear what pages or scenes Plaintiff is referencing, but the description of these settings is so generic that it cannot possibly be protectable expression.[8]

_____

[8]    The SAC also alleges that both works feature a resort hotel and that the events in the "cruise ship and the resort in DEAD AHEAD track the events taking place on the

Therefore, despite surface level and unprotectable similarities, the settings of both works are actually materially different.

### 4. The Supposedly Similar Themes Are Too Generic to Be Protectable and Dead Ahead Lacks Several Themes in Fear the Walking Dead

The SAC alleges the works share three basic themes: life vs. death, nature of survival, and resilience of the human spirit.  (SAC ¶ 43.)  Assuming those are shared themes, they are so well-worn that they are not protectable because "there is no protection for stock themes or themes that flow necessarily from a basic premise." *Marcus*, 279 F. Supp. 3d at 1067.  Fighting against zombies, trying to survive in a new world where zombies exist, and having to overcome obstacles are part and parcel of the basic zombie apocalypse storyline and cannot be protected.  *See Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1113 ("[A]lthough the works share themes of self-reliance and the importance of friendship and teamwork, these themes often predominate stories of competition, especially those where the protagonist begins the story as cocky and self-centered, and are thus generic and not protectable.").

Additionally, the SAC fails to mention that *Fear the Walking Dead* has other themes not present in *Dead Ahead* including:

- the testing of familial bonds during times of crisis (Travis realizing his son Chris is too dangerous to keep around the other survivors; engaged couple Madison and Travis' disagreements over whether to help other survivors)
- whether humans are capable of redemption (Daniel Salazar's history of killing and torture; Nick's drug addiction; Madison, Travis, and Chris' killing of other human survivors after the apocalypse)

---

resort and the yacht in FEAR THE WALKING DEAD."  (SAC ¶ 44(a).)  As discussed above, the sequence of events in those locations is not similar, and it goes without saying that a resort hotel is not the same setting as a cruise ship.

1     The themes in the works are not substantially similar in any protectable respect.

2     **5.**    **The Moods of the Works Are Materially Different**

3     The SAC alleges that the mood in both works is "dark, deliberate, weighty, and

4 purposeful" and "sad and somber . . . ." (SAC ¶ 44(b).) Even if true, similarities in

5 mood because both works are broadly in the same genre are insufficient to satisfy the

6 extrinsic test. *Zella*, 529 F. Supp. 2d at 1136; *Olson*, 855 F.2d at 1451.

7     But on closer inspection, the mood of the two works is significantly different.

8 *Dead Ahead* is a classic horror story told in gothic terms through the diary entries and

9 inner monologue of a first-person narrator. Captain Jack's descriptions of despair are

10 phrased in poetic, melodramatic terms. For example, Captain Jack writes in his diary,

11         "If it was God who had made the sun shine that first day, was it His

12         way of saying goodbye? Maybe He was washing His hands of

13         humanity's bullcrap and wicked greed? Either way it left the gates

14         of hell wide open for business and business is good!"

15     In contrast, the mood in *Fear the Walking Dead* is modern and realistic. The

16 story is told from an omniscient third-person perspective and the characters' internal

17 monologues are not expressly stated. Although the characters in *Fear the Walking*

18 *Dead* are presented with the same distressing problem of living in a time where

19 zombies are present, they confront the problem head on in contemporary terms, they

20 do not use flowery language to bemoan their state of affairs.

21     Beyond the generic similarities inherent in zombie stories, the moods of the two

22 works are not substantially similar.

23     **6.**    **Dialogue Similarities Do Not Exist**

24     A plaintiff must establish "extended similarity of dialogue" in order to

25 adequately allege substantial similarity of dialogue. *Olson*, 855 F.2d at 1450. Here,

26 Plaintiff does not even attempt to point out a single example of shared dialogue, let

27 alone an extended similarity. Instead, Plaintiff merely alleges that one character in

28 each work speaks in "a mixture of English and Spanish." (SAC ¶ 42.) This is

insufficient to satisfy the extrinsic test.  *See Benay v. Warner Bros. Entm't, Inc.*, 607

F.3d 620, 628 (9th Cir. 2010) (finding no similarity where shared use of Japanese

words "naturally flows from the narrative of an American military advisor in Japan").

### 7.   The Pacing of the Two Works Is Not Substantially Similar

The SAC contends that both stories occur at "breakneck speeds, with gory,

violent zombie attacks lurking around every corner, [and are] populated by characters

who are in perpetual flight from horrific, ungodly, unearthly, lethal predators."  (SAC ¶

44(c).)  That there is an ever-present threat of zombie attack is a natural outgrowth of

the generic zombie storyline and therefore not protectable.  In any event, the pace of

*Fear the Walking Dead* is certainly not at "breakneck speeds" as alleged.  There are

long stretches in each episode of *Fear the Walking Dead* where the characters are not

fending off zombies but are dealing with other problems that bring their own dramatic

tension.  Although zombie attacks are an important part of the show, those moments

punctuate an otherwise relatively contemplative, character-driven show, where the key

moments from episode to episode are not zombie attacks but human drama.

Therefore, any similarities in pacing are the result of the general plot and are

insufficient to satisfy the extrinsic test. *Olson*, 855 F.2d at 1451; *see also Campbell*,

718 F. Supp. 2d at 1115 ("[T]o the extent Plaintiff alleges that the action rises and falls

in a similar manner in both works, '[p]ace, without more, does not create an issue of

overall substantial similarity between the works.'") (citation and modification

omitted).

### 8.   Summary of Extrinsic Test Factors

None of the "extrinsic test" factors point towards a finding of substantial

similarity.  *Dead Ahead* and *Fear the Walking Dead* feature plots, sequences of events,

characters, themes, moods, settings, dialogue, and pace that are all meaningfully

different in any protectable expression.

## IV. THE BREACH OF FIDUCIARY DUTY CLAIM ALSO FAILS AS A MATTER OF LAW

As shown above, the Skybound Defendants did not infringe Plaintiff's copyright as a matter of law. Plaintiff's Second Claim for Relief for breach of fiduciary duty is rooted in the alleged copyright infringement. Because there was no copyright infringement as a matter of law, the breach of fiduciary duty claim fails as well as a matter of law.

## V. CONCLUSION

*Dead Ahead* and *Fear the Walking Dead* share no substantial similarities. As a result, Plaintiff cannot satisfy the extrinsic test necessary to plead a claim for copyright infringement. Thus, the First and Second Claims for Relief should be dismissed with prejudice and without leave to amend.

Dated: November 2, 2018

GRODSKY & OLECKI LLP
Allen B. Grodsky
Courtney L. Puritsky
Tim B. Henderson

By: _____/s/ Tim B. Henderson_____
Tim B. Henderson

Attorneys for Defendants Skybound Productions, Inc., Circle of Confusion Productions, LLC, New Circle of Confusion Productions, Inc., Robert Kirkman, LLC, Robert Kirkman, and David Alpert

20