DAVID M. GIVEN (State Bar No. 142375)
M. JAKE FEAVER (State Bar No. 318926)
PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
Telephone:  415-398-0900
Fax:            415-398-0911
Email: dmg@phillaw.com
          mjf@phillaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE

| | |
|---|---|
| MELVIN WILLIAM SMITH, JR., | **Case No: 5:18-cv-03803-LHK** |
| Plaintiff, | **PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT** |
| v. | |
| AMC NETWORKS, INC., et al., | Date: Jan. 17, 2019 |
| Defendants. | Time: 1:30 P.M. |
| | Courtroom 8, 4th Floor |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.    INTRODUCTION .............................................................................. 1

II.   ALLEGATIONS AND CLAIMS FOR RELIEF .............................. 2

III.  THE SAC SATISFIES THE PLEADING REQUIREMENTS FOR A COPYRIGHT INFRINGEMENT CLAIM .................................................................. 2

IV.   ASSESSING THE WORKS' SUBSTANTIAL SIMILARITY REQUIRES THE COURT TO CONSIDER EVIDENCE OUTSIDE THE SAC NOT SUSCEPTIBLE TO JUDICIAL NOTICE ................................................................. 3

V.    SHOULD IT DECIDE TO CONSIDER THOSE MATTERS PRESENTED BY THEIR REQUEST FOR JUDICIAL NOTICE, THEN THE COURT MUST TREAT DEFENDANTS' MOTIONS AS ONE FOR SUMMARY JUDGMENT ...... 5

VI.   SHOULD THE COURT STILL BE PERSUADED TO LAUNCH A SUBSTANTIAL SIMILARITY ANALYSIS NOW, THE SAC ARTICULATES MULTIPLE PROTECTED ELEMENTS FOUND IN BOTH WORKS IN ISSUE – CONFIRMED BY REVIEW OF THE WORKS ........................................... 7

VII.  DEFENDANTS' ATTACK ON THESE SIMILARITIES SUFFERS FROM MULTIPLE DEFECTS – THEIR FILTERING REDUCES ALL CREATIVE ELEMENTS TO THEIR GENERIC CORE; DEFENDANTS' ANALYSIS RELIES ON IRRELEVANT PORTIONS OF THE WORKS IN ISSUE; AND THE TRIVIAL DIFFERENCES DEFENDANTS POINT TO DO NOT UPSET THE PROPONDERANCE OF SIMILARITIES TO DEAD AHEAD PERVADING THE HIGH SEAS NARRATIVE ............................................................... 13

VIII. SOME OF THE DIFFERENCES DEFENDANTS IDENTIFY BETWEEN ELEMENTS OF THE TWO WORKS BOLSTER THE PLAUSIBILITY OF PLAINTIFF'S ALLEGATIONS OF SIMILARITY ................................... 17

IX.   PLAINTIFF'S FIDUCIARY DUTY CLAIM SURVIVES REGARDLESS ............. 19

X.    CONCLUSION ............................................................................ 20

**TABLE OF AUTHORITIES**

**Cases**

*Abdullah v. Walt Disney*,
   2016 WL 5380930 (C.D. Cal. Mar. 14, 2016) .................................................9

*Antonick v. Electronic Arts*,
   841 F.3d 1062 (9th Cir. 2016) .................................................6

*Apple v. Microsoft*,
   35 F.3d 1435 (9th Cir. 1994) .................................................4

*Bank Melli v. Pahlavi*,
   58 F.3d 1406 (9th Cir. 1995) .................................................5

*Benay v. Warner Bros.*,
   607 F.3d 620 (9th Cir. 2010) ............................................. 4, 19

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985) .................................................9

*Blizzard Enter. v. Lilith Games*,
   2018 WL 1242053 (N.D. Cal. Mar. 8, 2018).................................................16

*Bradbury v. CBS*,
   287 F.2d 478 (9th Cir. 1961) .................................................15

*Brocade Communications v. A10 Networks*,
   873 F. Supp. 2d 1192 (N.D. Cal. 2012) .................................................6

*Capcom v. MKR Group*,
   2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) .................................................8

*Cavalier v. Random House*,
   297 F.3d 815 (9th Cir. 2002) .................................................14

*Christianson v. West Pub.*,
   149 F.2d 202 (9th Cir. 1945) .................................................6

*Edwards v. Cinelou Films*,
   2016 WL 9686986 (C.D. Cal. June 22, 2016) .................................................9

*Ets-Hokin v. Skyy Spirits*,
   225 F.3d 1068 (9th Cir. 2000) .................................................8

*Feist v. Rural Tel.*,
   499 U.S. 340 (1991).................................................2, 8

*Funky Films v. Time-Warner*,
   462 F.3d 1072 (9th Cir. 2006) .................................................4, 9

*Goodness Films v. TV One*,
   2013 WL 12145508 (C.D. Cal. Feb. 28, 2013) .................................................19

*Gorski v. Gymboree,*
 2014 WL 3533324 (N.D. Cal. July 16, 2014) .......................................4

*Kouf v. Walt Disney,*
 16 F.3d 1042 (9th Cir. 1994) .......................................7

*Metcalf v. Bochco,*
 294 F.3d 1069 (9th Cir. 2002) .......................................8

*Newton v. Diamond,*
 388 F.3d 1189 (9th Cir. 2004) .......................................15

*Printex Indus. v. Aeropostale,*
 676 F.3d 841 (9th Cir. 2012) .......................................15

*Rentmeester v. Nike,*
 883 F.3d 1111 (9th Cir. 2018) .......................................6

*Shaw v. Lindheim,*
 919 F.2d 1353 (9th Cir. 1990) .......................................6

*Sheldon v. MGM,*
 81 F.2d 49 (2d Cir. 1936) .......................................15

*Sid & Marty Krofft v. McDonald's,*
 562 F.2d 1157 (9th Cir. 1977) .......................................6

*Silas v. HBO,*
 201 F.Supp.3d 1158 (C.D. Cal. 2016) .......................................8

*Skidmore v. Led Zeppelin,*
 905 F.3d 1116 (9th Cir. 2018) .......................................7

*Stewart v. Abend,*
 495 U.S. 207 (1990) .......................................15

*Sugarfina v. Sweet Pete's,*
 2017 WL 4271133 (C.D. Cal. Sept. 25, 2017) .......................................17

*Universal Pictures v. Harold Lloyd Corp.,*
 162 F.2d 354 (9th Cir. 1947) .......................................14, 17

*Walker v. Time Life,*
 784 F.2d 44 (2nd Cir. 1986) .......................................9

*Williams v. Gaye,*
 895 F.3d 1106 (9th Cir. 2018) .......................................6

*Wilson v. Walt Disney,*
 2014 WL 447391 (N.D. Cal. July 30, 2014) .......................................8, 16, 17

iii
**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**
Case No: 5:18-cv-03803-LHK

**Rules**

Ninth Cir. Model Civ. Jury Instr. 17.19 (2017) ........................................................... 10

Rule 12(d) ........................................................................................................................ 8

**Treatises**

Nimmer on Copyright

§ 13.03[F][2][a] (2018) ............................................................................................ 16

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**
Case No: 5:18-cv-03803-LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Defendants bring two motions under Rule 12(b)(6) to dismiss Plaintiff's Second Amended Complaint, ECF No. 59 (the "SAC"), asserting claims for copyright infringement and breach of fiduciary duty against them.  Defendants' briefing on their motions totals 45 pages.  But in all that briefing and the accompanying evidentiary submissions, the motions boil down to a single issue: Whether under the Ninth Circuit's "extrinsic test" for copyright infringement, the two works are "substantially similar."

As Defendants' request for judicial notice reflects, the Court cannot rule on that subject in the absence of evidence outside the SAC and the works in issue.  That request acknowledges that the matter of substantial similarity can only be decided on a factual record.  But the evidence Defendants wish the Court to consider now is not properly before it.  See Plaintiff's Obj. to RJN, filed herewith.  On that basis alone, the Court can and should deny the motions.  See Section IV., below.

Should the Court overrule Plaintiff's objection to that evidence and not exclude it, then under Rule 12(d) the Court "must" treat Defendants' motions as one for summary judgment.  Under Ninth Circuit law, Plaintiff is entitled to a "reasonable opportunity" to present pertinent evidence on the motions.  See Section V., below.  Plaintiff intends to proffer evidence, including expert testimony, going to those issues pertinent to "dissection" and comparison of the works in issue under the extrinsic test; Plaintiff expects that evidence to counter Defendants' assertion that the pertinent elements of Plaintiff's work are "generic" or "stock" or unoriginal and therefore unprotected as a matter of law.  See Counsel Decl., filed herewith.

Defendants do not deny that the two works bear many similarities.  And, should it still wish to engage in the extrinsic analysis now, the Court's review of the two works will confirm that.  See Section VI., below.  Defendants contend only that those similarities are not legally meaningful.  Defendants are wrong for a variety of reasons, mostly because they've taken extraordinary liberties with the Circuit's extrinsic test as applied to the works in issue here.  See Section VII., below.

1

## II.     ALLEGATIONS AND CLAIMS FOR RELIEF

2       This is a civil action for copyright infringement of protected elements of Plaintiff's three-

3   volume comic book series entitled DEAD AHEAD, and for breach of fiduciary duty with respect

4   to the same set of facts, which Defendants copied and subsequently used, performed and

5   exploited without permission in the television series FEAR THE WALKING DEAD.  See SAC

6   at ¶ 1.

7       Plaintiff alleges that Defendants infringed his copyright in DEAD AHEAD by copying

8   those protected portions and incorporating them (A) in advertising material for the second season

9   of FEAR THE WALKING DEAD, and (B) in portions of episodes from that season of FEAR

10  THE WALKING DEAD, all without Plaintiff's permission. See SAC at ¶¶ 32-33 (advertising

11  material), 39-44 (second season episodes).

12      Plaintiff also alleges that defendant David Alpert (credited as "Executive Producer" of

13  FEAR THE WALKING DEAD) served as Plaintiff's agent, charged with consulting with motion

14  picture and television studios for the use or exploitation of DEAD AHEAD in those media and,

15  aided and abetted by his business partner, defendant Robert Kirkman (Chief Operating Officer of

16  the original publisher of DEAD AHEAD and credited as "Executive Producer" and "Creator" of

17  FEAR THE WALKING DEAD), as well as by the other Defendants, breached his fiduciary duty

18  to Plaintiff by misappropriating his intellectual property, failing to preserve Plaintiff's

19  confidences and acting with a conflict of interest.  See SAC at ¶¶ 15-16, 23-26, 47-50.

20
## III.    THE SAC SATISFIES THE PLEADING REQUIREMENTS FOR A COPYRIGHT INFRINGEMENT CLAIM

21

22      Plaintiff briefed this subject to the Court.  See ECF No. 52, at 2 et seq.  There is no

23  heightened pleading standard for copyright infringement claims.  On its face, the SAC plausibly

24  alleges the necessary elements of a copyright infringement claim, i.e., (A) ownership of a valid

25  copyright, and (B) copying of original elements of DEAD AHEAD.  *Feist v. Rural Tel.,* 499 U.S.

26  340, 361 (1991).

27

28

1    The motions concede that the Court cannot adjudicate the matter of substantial similarity

2    in Defendants' favor on the basis of the SAC's allegations, ergo the request for judicial notice.

3    See ECF No. 67-1.  That concession constitutes an acknowledgement that those allegations

4    suffice for pleading purposes to sustain Plaintiff's claim for copyright infringement.  And they

5    do.

6    The SAC contains all of the claim's necessary elements.  See SAC at ¶¶ 35-45.  Its

7    allegations, including those pertaining to Defendants' copying of DEAD AHEAD, are plausibly

8    stated under Iqbal/Twombly.  And they give Defendants adequate notice of Plaintiff's claim.

9    That is all the rules and law require at this stage of the proceedings.

10   **IV.   ASSESSING THE WORKS' SUBSTANTIAL SIMILARITY REQUIRES THE**
     **COURT TO CONSIDER EVIDENCE OUTSIDE THE SAC NOT SUSCEPTIBLE**
11   **TO JUDICIAL NOTICE**

12   Defendants do not attack the baseline legal theory of Plaintiff's copyright infringement

13   claim.  Rather, by their current motions, Defendants ask the Court to adjudicate at the pleading

14   stage the question of whether, under the Circuit's extrinsic test for copyright infringement, the

15   works in issue are substantially similar. "Even if we had access to and copied from Plaintiff's

16   work," to paraphrase Defendants' position in their motions, "we didn't take anything from

17   DEAD AHEAD protected by copyright law."  See ECF No. 66, at 5 & n. 2; ECF No. 67, at 4 &

18   n. 4.

19   The arguendo ("even if") predicate is scarcely a stretch.  Among other things, the SAC's

20   allegations put Defendant Kirkman – who was familiar with the contents of DEAD AHEAD as

21   both COO of Plaintiff's comic book publisher and business partner of Plaintiff's motion picture

22   agent and fiduciary – in the room when the writers chose a setting identical to DEAD AHEAD

23   for the second season of FEAR THE WALKING DEAD.  See SAC at ¶ 31 & n. 2.  The

24   allegations regarding use of the "skull and boat" image also show Defendants' access to and

25   copying of Plaintiff's work.  See, e.g., SAC at ¶¶ 32 & 33.

26   As Defendants acknowledge, to perform the Circuit's extrinsic test, the Court must

27   identify, sort and "filter" the protected and unprotected elements of DEAD AHEAD, and then

28

compare them to FEAR THE WALKING DEAD.  See ECF No. 67, at 6-9.  Doing so is a three-step process, which this Court reviewed most recently in *Gorski v. Gymboree*, 2014 WL 3533324, *4 (N.D. Cal. July 16, 2014).  The Court's decision there suggests that the latter two steps are the focus here; as the Court noted, the "salient inquiry" is whether the protectable elements of the works are substantially similar, citing *Benay v. Warner Bros.*, 607 F.3d 620, 624 (9th Cir. 2010).  In the present case, that means a "detailed examination" of the works in issue, *Funky Films v. Time-Warner*, 462 F.3d 1072, 1075 (9th Cir. 2006), as well as "if necessary" consideration of "expert testimony" to "dissect" protected elements from unprotected ones, *Apple v. Microsoft*, 35 F.3d 1435, 1443 (9th Cir. 1994).

To perform that task, Defendants request that, in addition to DEAD AHEAD and FEAR THE WALKING DEAD, the Court take judicial notice of the "generic elements of action-adventure, thriller, and horror films and television series, including those involving invasions or outbreaks of some sort [!] and those that take place at sea."  See ECF No. 67-1, at 2.  These include various descriptions repurposed from the SAC – many demonstrably incomplete (see Section VII., below), like "ragtag groups of individuals," "characters seeking refuge and searching for supplies" and "attempting to evade the military in emergency situations" – which Defendants contend "are easily verifiable simply by watching television for any length of time." Id. at 3, et seq.

Defendants' briefing also asks the Court to consider multiple works in the "zombie" canon.  (Defendants toss in GILLIGAN'S ISLAND for good measure.)  Defendants refer to most of those works in their request for judicial notice, without asking for judicial notice of them.  Id. This backdoor proffer also purports to support Defendants' contention that the similarities noted in the SAC are "generic" or "stock" or that pertinent elements of Plaintiff's work are "unoriginal."  See ECF No. 66, at 7; ECF No. 67, at 8.  So, for example, Defendants assume familiarity with WORLD WAR Z, the book as well as the motion picture (starring Brad Pitt and Mireille Enos), the "zombie classic" DAWN OF THE DEAD, and episodes of Defendants' own related television and comic book series, THE WALKING DEAD.  See ECF No. 67, at 8 & 14.

If these matters are indeed the foundation for Defendants' motions, as Defendants contend in their briefing, then the Court must deny the motions.  How, for instance, are the "generic elements of action-adventure, thriller, and horror films and television series, including those involving invasions or outbreaks of some sort and those that take place at sea" either "generally known" or "accurately and readily determined from sources whose accuracy cannot reasonably be questioned" as required under Rule of Evidence 201?  See Plaintiff's Obj. to RJN, at 1 et seq.

As for the other works cited in Defendants' motions, the Court does not have those before it. Nor can the Court determine conclusively from a request for judicial notice the pertinent canon.  So those works cannot serve to rebut the SAC's allegations or to clarify the generic or unprotected elements of Plaintiff's work.  Id.  And material appearing on YouTube and Wikipedia, see, e.g., ECF No. 67, at 19 & n. 18 (advertising material proffered as prior art for Plaintiff's "skull and boat" image), are not self-authenticating and do not otherwise constitute evidence in a court of law.  See Plaintiff's Obj. to RJN, at 4.

## V.  SHOULD IT DECIDE TO CONSIDER THOSE MATTERS PRESENTED BY THEIR REQUEST FOR JUDICIAL NOTICE, THEN THE COURT MUST TREAT DEFENDANTS' MOTIONS AS ONE FOR SUMMARY JUDGMENT

Rule 12(d) provides that if "matters outside the pleadings presented to and not excluded by the Court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

Should the Court overrule Plaintiff's objection to Defendants' request for judicial notice or otherwise choose to consider those matters presented by it, then the rule applies.  Because the request relies upon review of other creative works (the backdoor proffer referred to above), Defendants have presented to the Court matters outside the pleadings "not excluded by the Court."  In that event, the Court must apprise the parties that it "will look beyond the pleadings to extrinsic evidence and give them an opportunity to supplement the record."  *Bank Melli v. Pahlavi*, 58 F.3d 1406, 1408 (9th Cir. 1995).

Those matters (read: evidence) open the door to, among other things, an expert providing context to and interpretation or assessment of matters such as generic elements or stock characters within the relevant genre or canon, including where that genre or canon begins and ends, so as to identify relevant similarities between the two works in question. *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990) (involving television scripts). The SAC signaled Plaintiff's intention to proffer such evidence. See SAC at ¶ 40 & n. 3.

Plaintiff expects and intends to dispute Defendants' characterization of elements of his work as "generic" or "stock" via expert testimony, just as one would expect a technology company to do in a case involving its source code, for example. See Counsel Decl., at ¶ 2. Plaintiff expects to retain testifying experts for this purpose. Id.

The Ninth Circuit has long recognized, beginning with the seminal case, that orders of proof under the extrinsic test may and often do include expert testimony on subjects like "generic elements" or "elements common to a given genre" – terms repeatedly invoked in their papers that Defendants ask the Court to filter out of its similarity analysis. *Sid & Marty Krofft v. McDonald's*, 562 F.2d 1157, 1164 (9th Cir. 1977) (involving television show and commercial). See also *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018) (involving musical compositions; approving instructions and explaining that extrinsic test requires "analytical dissection of a work and expert testimony"); *Antonick v. Electronic Arts*, 841 F.3d 1062, 1067 (9th Cir. 2016) (involving source code; same). Cf. *Brocade Communications v. A10 Networks*, 873 F. Supp. 2d 1192, 1218 (N.D. Cal. 2012) (denying summary judgment where expert testimony proffered to identify "protected" elements of plaintiff's source code used by defendant). Research fails to disclose a single case where the Ninth Circuit affirmed in a published opinion the dismissal on summary judgment (let alone on a Rule 12 motion) of a case alleging infringement of a literary work like DEAD AHEAD without consideration of such evidence when proffered – as opposed to a case involving photographs, *Rentmeester v. Nike*, 883 F.3d 1111 (9th Cir. 2018), or maps, *Christianson v. West Pub.*, 149 F.2d 202 (9th Cir. 1945).

The Ninth Circuit's recent decision in the "Stairway to Heaven" case is instructive.  In *Skidmore v. Led Zeppelin*, 905 F.3d 1116, 1136 (9th Cir. 2018) (petition for rehearing pending), the court reversed a jury verdict due to error in two instructions going to application of the extrinsic test.  That error consisted of the district court's instructing the jury that copyright law did not protect certain "common musical elements" which, the court found, "undercut testimony by [plaintiff's] expert that [defendant] copied [one such element] used in an original manner" and "that [the two songs in issue] were similar because of the combination of otherwise unprotectable elements." Id. at 1129.  The court concluded that "these instructions were prejudicial as they undermined the heart of [plaintiff's] argument that [the two songs in question] were extrinsically substantially similar." Id. at 1130.

By their request for judicial notice, Defendants acknowledge a core premise of Plaintiff's opposition to their motions.  The Court and, ultimately, the jury can and should consider extrinsic evidence to perform the extrinsic test in this case.  Just as the notes to the pertinent jury instruction recognize, the state of the factual record will dictate the nature and scope of that inquiry.  See Ninth Cir. Model Civ. Jury Instr. 17.19 (2017) ("The Committee recommends that the court and counsel specifically craft instructions on substantial similarity based on the particular work(s) at issue, the copyright in question, and the evidence developed at trial.").

**VI.    SHOULD THE COURT STILL BE PERSUADED TO LAUNCH A SUBSTANTIAL SIMILARITY ANALYSIS NOW, THE SAC ARTICULATES MULTIPLE PROTECTED ELEMENTS FOUND IN BOTH WORKS IN ISSUE – CONFIRMED BY REVIEW OF THE WORKS**

To grant the motions at this stage of the proceedings, the Court must "conclude that no reasonable juror could find substantial similarity of ideas and expression" in the two works in issue. *Kouf v. Walt Disney*, 16 F.3d 1042, 1045 (9th Cir. 1994) (summary judgment).  In making that assessment under the Circuit's extrinsic test, certain bedrock copyright law principles apply – and all must be applied at this stage of the proceedings in Plaintiff's favor where the Court harbors any doubt in the matter.

**First**, a protected element can consist of prior art expressed in an original way. *Feist*, 499 U.S. at 345–46. **Second**, the bar for originality in a protected element is low. *Ets-Hokin v. Skyy Spirits*, 225 F.3d 1068, 1076 (9th Cir. 2000). **Third**, an arrangement or sequence of unprotected elements can constitute the artistic expression of an idea, rather than merely a generic idea or series of generic ideas. See *Feist*, 499 U.S. at 362 (involving telephone directories); *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) (involving screenplay and television series); *Wilson v. Walt Disney*, 2014 WL 4477391, at *1 (N.D. Cal. July 30, 2014) (Chhabria, J.) (involving short films).

So, for example, "a ragtag group of individuals" or "a ragtag group of individuals attempting to evade the military in emergency situations" or even "a ragtag group of individuals attempting to evade the military in emergency situations seeking refuge and searching for supplies" may not be protectable. But "a ragtag group of eight individuals on a medium-sized boat on the Pacific Ocean off the coast of Southern California heading toward Mexico seeking refuge from and attempting to evade an active military operation intent on herding humans away from the coast but forced to come to shore to search for supplies while zombies who have learned to adopt to water pose an imminent threat even on the high seas," in the right circumstance (i.e., along with other similarities), is.

This latter example (amplified below) distinguishes this case from *Capcom v. MKR Group*, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008). There, the copyright claimant failed to identify "any similarity between Dead Rising," an open world or "sandbox" videogame (i.e., one in which players can participate in the virtual world in any way they choose), "and any *protected* element of Dawn of the Dead," a motion picture. Judge Seeborg found that the "random similarities" cited by the claimant had no connection to one another and were exceedingly few and weak – for example, a helicopter landing; a setting in a mall; an African-American man; and a zombie wearing plaid and covered in blood.

The same is true in *Silas v. HBO*, 201 F.Supp.3d 1158, 1184 (C.D. Cal. 2016), where the similarities bore "no common pattern," and after "commenc[ing] with the death of the father and

return of the 'prodigal son,' … the plots of the two stories develop quite differently." And it's true for virtually all of the other cases Defendants rely upon. See, e.g., *Funky Films*, at 1081 (finding totality of similarities at "very high level of generality" consisting of "the family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business"); *Walker v. Time Life*, 784 F.2d 44, 49-50 (2d Cir. 1986) (explaining that plaintiff's book is "an account of actual events" and "presents a series of randomly-ordered sketches of police life and work, without significant character or plot development," whereas defendants' film is "intensely plotted"); *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) (explaining that plaintiff's story is about a doctor motivated by the death of her best friend to investigate brain deaths of young women set primarily in a hospital, whereas defendants' story is about a police detective motivated by career advancement to investigate the disappearances of young women and has "[o]nly a few, relatively minor scenes" in a hospital); *Edwards v. Cinelou Films*, 2016 WL 9686986, at *4 (C.D. Cal. June 22, 2016) (explaining that only similarities between works were the "vague similarity of the protagonist taking revenge on witches because a witch previously killed his family," "plot points that naturally flow from this generic overarching plotline," "commonly-used artistic devices," and "completely random and isolated similarities"); *Abdullah v. Walt Disney*, 2016 WL 5380930, at *5-9 (C.D. Cal. Mar. 14, 2016) (explaining that plaintiff's work is "about an evil mountain witch who abducts a princess, and a pair of princes who rescue her," whereas defendants' work is "about a princess who learns to control her powers through self-acceptance and love, and a celebration of sisterhood" and the princess is the heroine rather than the "damsel in distress").

The record here is entirely different. As the SAC reflects, many elements of the narrative works in issue are similar in substantial and meaningful ways. See SAC at ¶¶ 40-44. And a review of the pertinent episodes of FEAR THE WALKING DEAD will confirm that they and DEAD AHEAD share many similarities in plot, sequence of events, characters, theme and mood, among other things, just as alleged in the SAC (a corresponding concordance with citations to

the work may be found at Counsel Decl., at ¶ 6 & Ex. A), all of which are connected throughout the relevant narrative:

**Plot and Sequence of Events**

Both works share the following plot and sequence of events. The plot begins with a makeshift group of eight characters who find themselves on a boat together in the midst of a zombie outbreak.  The boat, stocked with months of supplies, is located in waters off the coast of Southern California, and heads south in the direction of Mexico.  The crew (as they come to self-identify) believe remaining out at sea will provide a sanctuary from zombie attack; that sense of safety is exemplified in several ways (fishing, relaxing on deck, surveying the sea, communicating via ham radio).  That proves wrong, when it is revealed early in the narrative that zombies have adapted to water.

Meanwhile, the government has called out the military, which acts as a further threat to survival – in addition to battling zombies, the military has commenced destroying coastal cities with the aim of herding non-infected humans away from the coast.  The intention is for those humans to be either killed as suspected zombies or conscripted to work, possibly as slave labor.

The crew continues heading south. In a pivotal scene, the crew members gather together and while arrayed around a table surface, consult a paper map while attempting to chart a course to a new destination.  This moment serves to allow further expository information regarding other individuals on the boat.  The survivors decide to approach small islands, believing them to be safest.

Around the same time, the crew learns that the zombie outbreak is far larger than first suspected.  While on its initial course south, the boat's engine malfunctions.  While the boat is without a working engine, it happens to be close enough to an island to allow part of the crew to disembark onto a beach to search for supplies.

The intention is to make a quick trip on shore, to grab supplies and to get right back on the boat.  But one crew member drifts away, creating alarm among group members and evoking a Spanish epithet from another member.  Those on the island encounter masses of zombies and

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**
Case No: 5:18-cv-03803-LHK

flee back to the boat for safety while the boat's engine is being fixed under extreme duress and the tension of losing the crew to a zombie attack. The boat's engine revs up just in the nick of time to get the crew out safely.

In conjunction with the island visit, members of the crew have a conversation about the growing discord and distrust among them. The crew seems aimless, unsure of where its next destination will be – supplies are dwindling, and prospects are dim.

The crew arrives at a resort destination (beachside hotel; cruise ship). The crew believes it has found a "permanent" home. While the crew belies a sense of dread, the lure of luxury accommodations and the lack of options leads the crewmembers to take their chances at the resort location.

Once inside, the crewmembers initially meet little resistance. But it quickly develops that they will have to survive a zombie attack, the size and complexity of which they have not previously encountered. In one scene, a crewmember survives by escaping zombies via an elevator shaft – and immediately encounters additional human survivors. The crew convinces the unknown survivors to work together toward taking over the resort locale.

The DEAD AHEAD story, as it appears in FEAR THE WALKING DEAD, ends here.

**Setting**

Both works feature stories of fleeing a zombie apocalypse on the high seas. The works' pertinent narrative starts at the same place and takes place in the same part of the ocean. Both prominently feature a resort location. A significant part of that narrative take place on mid-size vessels travelling south from the Southern California coast toward Mexico. Elevator shafts and engine rooms are used as places of refuge and tension in both works. In both narratives, zombies invade sandy knolls and dunes that emerge from the Pacific Ocean, where the main characters are forced into battle and barely escape with their lives.

**Characters**

Portrayal of the character "Red" in both works is virtually identical.  (Defendants claim that their work does not refer to this character as "Red."  Yes, it does, in S2E5 at the 36:30 mark.)

Captain Jack (DEAD AHEAD) is the central protagonist and a male educator; Travis Manawa (FEAR THE WALKING DEAD) is the central protagonist and a male educator. Circumstances thrust both into a leadership role that they are ill-prepared for, given their ostensible backgrounds, but rise up to the occasion.

Emile (DEAD AHEAD) is a Mexican veteran; Daniel (FEAR THE WALKING DEAD) is a Salvadorian veteran.  Both demonstrate proficiency with military-style weapons and combat tactics, and both speak in a mixture of English and Spanish.

Beau Chapman (DEAD AHEAD) is a wealthy financier; Victor Strand (FEAR THE WALKING DEAD) is a wealthy businessman who built a fortune through real estate investment and the buying of distressed debt.

**Theme**

Both works' pertinent narrative explores themes of God, the afterlife, damnation and salvation.  There are repeated references to God, hell, and the devil.  Themes of fear and loathing, struggling with identity, the nature and value of survival, resilience in the face of danger and destruction as well as the meaning of life and death permeate throughout.

**Mood**

Both works present moods that are dark, deliberate, weighty, and purposeful.  Both works eschew any kitsch or comedy.

1

2

3

4

**VII.   DEFENDANTS' ATTACK ON THESE SIMILARITIES SUFFERS FROM MULTIPLE DEFECTS – THEIR FILTERING REDUCES ALL CREATIVE ELEMENTS TO THEIR GENERIC CORE; DEFENDANTS' ANALYSIS RELIES ON IRRELEVANT PORTIONS OF THE WORKS IN ISSUE; AND THE TRIVIAL DIFFERENCES DEFENDANTS POINT TO DO NOT UPSET THE PROPONDERANCE OF SIMILARITIES TO DEAD AHEAD PERVADING THE HIGH SEAS NARRATIVE**

5

6

7

8

9

10

11

12

13

14

15

While the Court must "analytically dissect" the works to "filter" unprotected elements under the extrinsic test, that process does not constitute an invitation to reduce every similarity noted by Plaintiff to its most basic constituent elements and then default to finding that those elements are generic and therefore unprotected.  To take just one example among many, the Skybound Defendants reduce Plaintiff's "skull and boat" image to "a picture of a boat on the water" which predictably, they go on to say, "is not protectable."  See ECF No. 66, at 15.  The AMC Defendants characterize over 40 elements of DEAD AHEAD as unprotectable, including its entire dialogue (which they deem "extremely limited, simplistic and cliché-ridden"), all of its themes and mood, and virtually its entire plot and sequence of events.  See, e.g., ECF No. 67, at 18.  These are, of course, subjective judgments – though they may help explain why Defendants took the liberties they did with Plaintiff's work.

16

17

18

19

20

21

22

23

The matter requires a far defter touch than that.  Professor Nimmer has written that the process of filtering ideas is "a pragmatic one, drawn not on the basis of some metaphysical property of 'ideas,' but by balancing the need to protect the labors of authors with the desire to assure free access to ideas." Nimmer on Copyright, § 13.03[F][2][a] (2018).  Isolating sentences and incomplete phrases from the operative pleading or employing a reductio ad absurdum on narrative or visual content, and then purporting to subject those restated elements to the extrinsic test for substantial similarity while adding a dash of distain for another artist's work, does a disservice to those ends, and is contrary to law.

24

25

26

27

Defendants make the broad point that the television series FEAR THE WALKING DEAD is different from the comic book series DEAD AHEAD.  See ECF No. 66, at 6-7; ECF No. 67, at 20.  But Plaintiff does not contend that Defendants infringed DEAD AHEAD over their entire television series, or even over the entire second season of that series. Just the reverse:

28

1   Plaintiff says that Defendants have adapted substantially all of *his* work into *theirs*.  "The whole

2   [series or season of FEAR THE WALKING DEAD] need not be copied [from DEAD AHEAD]

3   to constitute infringement," the Ninth Circuit held in *Universal Pictures v. Harold Lloyd Corp.*,

4   162 F.2d 354, 361 (9th Cir. 1947).  "The mere copying of a major sequence is sufficient."  Cited

5   with approval in *Cavalier v. Random House*, 297 F.3d 815, 825 (9th Cir. 2002).

6       The SAC specifically alleges that "portions of that season's 15 episodes were copied

7   from DEAD AHEAD."  See SAC at ¶ 40.  The allegations that follow focus on the particular

8   narrative from that season's episodes featuring humans escaping from, and then battling,

9   zombies on the high seas.  See SAC at ¶ 41-44.  The SAC expressly calls out the pertinent FEAR

10  THE WALKING DEAD episodes; they are Season Two, Episodes 1-5 & 9-13.  Among them,

11  Episodes 1-3 & 9-11 effectively contain the entire plot and sequence of events from DEAD

12  AHEAD.

13      Defendants' advertising material bears out that the "high seas" narrative is a major

14  sequence in FEAR THE WALKING DEAD.  See SAC at ¶ 32.  Anything referring to another

15  season of the series, or to episodes not relevant to the extrinsic test (for example, the last two of

16  the second season) or, for that matter, anything outside the "high seas" narrative, is irrelevant to

17  the extrinsic test.[1]  The Court must therefore exclude that material from its substantial similarity

18  analysis.

19       Defendants' motions are, however, riddled with references to those matters in their

20  substantial similarity analysis.  For example, Defendants point no less than ten times collectively

21  to elements of the first abbreviated (six-episode) season of their series to illustrate the

22  "differences" in the elements Plaintiff has identified as infringing DEAD AHEAD in FEAR THE

23  WALKING DEAD.  By way of further example, Defendants refer to scenes set in a Mexican

24

25  _____

26      [1] Plaintiff has a Request for Judicial Notice of the Defendants' relevant copyright
    registrations.  See Plaintiff's RJN, filed herewith.  These registrations reflect that each episode is
27  a stand-alone work.

28                                        14
                    **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**
                              Case No: 5:18-cv-03803-LHK

1   compound, in a drug rehabilitation center, and a supermarket, none of which Plaintiff alleges are

2   infringing.  See ECF No. 66, at 20.

3       These matters must give way in the Court's extrinsic similarity analysis.  "It is entirely

4   immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other

5   respects, similarity as to a substantial element of plaintiff's work can be shown."  *Printex Indus.*

6   *v. Aeropostale*, 676 F.3d 841, 851 (9th Cir. 2012)) (quoting Nimmer). "The relevant inquiry is

7   whether a substantial portion of the protectable material in the *plaintiff's* work was appropriated

8   – not whether a substantial portion of *defendant's* work was derived from plaintiff's work."

9   *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004) (quoting prior Circuit law; emphasis in

10  original).

11      "It is enough that substantial parts were lifted," Judge Learned Hand wrote many years

12  ago; "no plagiarist can excuse the wrong by showing how much of his work he did not pirate."

13  *Sheldon v. MGM*, 81 F.2d 49, 56 (2d Cir. 1936).  Accord *Stewart v. Abend*, 495 U.S. 207, 238

14  (1990) ("a taking may not be excused merely because it is insubstantial with respect to the

15  *infringing* work.") (emphasis in original).  "A contrary rule" – like the one Defendants advance

16  here – "would allow an unscrupulous defendant to copy large or qualitatively significant portions

17  of another's work and escape liability by burying them beneath non-infringing material in the

18  defendant's own work, even where the average audience might recognize the appropriation."

19  *Newton,* at 1195.

20      Defendants also make the narrower point that within the "high seas" narrative various

21  creative elements appear in FEAR THE WALKING DEAD having no analogue in DEAD

22  AHEAD.  But the Ninth Circuit has recognized that adapting a literary work like a comic book

23  series to the stage or screen often necessitates changes and additions; and "unless the copyright

24  statute is broad enough to cover any adaptation which contains the plot or theme of the story, it is

25  wholly ineffective." *Bradbury v. CBS*, 287 F.2d 478, 485 (9th Cir. 1961).  Among other things,

26  Plaintiff expects his experts to explain the industry practice of adaptation and how it might bear

27  on the jury's consideration of substantial similarity in this case.  See Counsel Decl., at ¶ 5.

28

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**
Case No: 5:18-cv-03803-LHK

1   Plaintiff might also develop percipient testimony on this subject from those who actually did the

2   creative work on the pertinent narrative from FEAR THE WALKING DEAD.

3         Defendants identify a series of characters in the pertinent portion of their work (like the

4   recovering drug addict Nick) not found in DEAD AHEAD.  See, e.g., ECF 67, at 22.  Putting

5   aside that many of these are almost entirely secondary or tertiary characters outside the pertinent

6   narrative, Plaintiff has made no allegation of infringement with respect to those other characters.

7   Again, Defendants have "the rule backward," as Judge Breyer recently put it in *Blizzard Enter. v.*

8   *Lilith Games*, 2018 WL 1242053, *6 (N.D. Cal. Mar. 8, 2018).

9         "That the [] Defendants may not have appropriated 133 other characters [] does not mean

10  Plaintiffs have failed to plausibly allege that the [] Defendants copied protectable expression

11  [regarding two characters] in [their works]."  *Id.*  In the event, as the Ninth Circuit suggested in

12  *Bradbury*, these differences do not negate Plaintiff's allegations of similarity under the extrinsic

13  test as a matter of law.  The Court and, ultimately, the jury must resolve this question on an

14  evidentiary record.

15        Finally, Defendants point to a series of minor or trivial differences between the actual

16  protected elements identified by Plaintiff and copied in Defendants' work.  For example,

17  Defendants point out that the second season of FEAR THE WALKING DEAD begins on shore.

18  But most of the crew is already on the water, and the narrative almost immediately segues to that

19  setting, where substantially all of the plot relevant to Plaintiff's claim figures. The total time that

20  elapses in FEAR THE WALKING DEAD before the other part of the crew shoves off from

21  shore amounts to a mere four minutes, precipitating the propeller scene, and all of that occurs

22  before the opening credits, which roll about two minutes later.

23        Disney made substantially the same argument in the FROZEN case.  And while he

24  sustained the Rule 12 motion as to the full-length feature film because plaintiff identified only

25  the two "snowman" characters' venturing onto the ice in a similar fashion and nothing more,

26  Judge Chhabria denied the motion as to the FROZEN teaser trailer.  *Wilson*, 2014 WL 4477391

27  at *2.  In doing so, Judge Chhabria noted the series of differences pointed out by Disney between

28

plaintiff's film and Disney's trailer, but nonetheless found that "the sequence of events in both works, from start to finish, is too parallel to conclude that no reasonable juror could find the works substantially similar." Id. Pointing out that DEAD AHEAD's boat is headed south toward Mexico and Central America and FEAR THE WALKING DEAD's boat is headed south toward Mexico (see, e.g., ECF No. 66, at 16) is a distinction without a difference for present purposes.

## VIII. SOME OF THE DIFFERENCES DEFENDANTS IDENTIFY BETWEEN ELEMENTS OF THE TWO WORKS BOLSTER THE PLAUSIBILITY OF PLAINTIFF'S ALLEGATIONS OF SIMILARITY

Minor or trivial differences between elements of the two works may constitute evidence of extrinsic similarity. Depending on the state of the evidence at trial, a jury could conclude that the differences are inconsequential to a finding of similarity precisely because they reflect the infringer's intent to mask the theft of more meaningful elements of the prior work. *Sugarfina v. Sweet Pete's*, 2017 WL 4271133, at *7 (C.D. Cal. Sept. 25, 2017) ("superficial changes to the characteristics of a copyrighted work in an accused work may be considered an attempt to disguise an intentional appropriation") (quotation and citation omitted). Cf. *Harold Lloyd*, at 360 ("an infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy") (quotation omitted).

Take, for example, the competing "skull and boat" images. See SAC at ¶¶ 32-33. Given what Plaintiff has plausibly alleged, the Court can reasonably infer that, apart from any extrinsic similarities in the two works, Defendants based their version on (read: directly copied from) DEAD AHEAD.

Notwithstanding the differences they urge, Defendants unquestionably appropriated the fundamental compositional elements of Plaintiff's work. These are the very ones praised by Defendant Kirkman's colleague at Image Comics in an email to Plaintiff – death skull, hovering over open sea and subject vessel, with flourishes emerging horizontally from the skull's eye sockets. See SAC at ¶ 33. (The AMC Defendants make a throw-away argument on prior art.

17

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**
Case No: 5:18-cv-03803-LHK

1   See ECF No. 67, at 19 & n. 18.  None of it is terribly convincing and, as previously noted, none

2   of it is authenticated.) Defendants also adopted Plaintiff's sunset coloration and reflection in the

3   water, the latter acting to set off and emphasize the image's main elements.  And they used their

4   image in the same metaphorical way as Plaintiff did in DEAD AHEAD to connote impending

5   doom – a "storm" that no "harbor" will provide safety from.

6           Do the changes Defendants made to Plaintiff's work – for instance, clouds instead of

7   birds or orange instead of red – therefore mean that the two versions are not substantially similar

8   under the extrinsic test?  Does the same result obtain if evidence emerges that Defendants made

9   those changes to mask their theft?

10           Or take, by way of further example, the character "Red" who appears in both DEAD

11   AHEAD and FEAR THE WALKING DEAD.  See SAC at ¶ 42.  The Court will find no

12   evidence for the untenable position that she constitutes a stock character in the genre, even in the

13   expanded record Defendants seek to make now.  Putting that aside, both works depict her as a

14   mysterious youngish redheaded female sharpshooter with long-hair and bangs who carries a long

15   rifle with a scope and sights with cool efficiency.

16           Defendants say the main difference between the two versions of Red is that Defendants'

17   Red is quickly dispatched – an interesting narrative choice (maybe a lawyer dictated her early

18   demise).  But does that narrative difference really mean that the similarities in character are less

19   relevant, or irrelevant, for purposes of assessing substantial similarity of that element of the two

20   works?  Or that, as Defendants contend, she is "strawberry-blonde," instead of red-headed?

21           The works in issue needn't be carbon copies of one another to sustain Plaintiff's claim for

22   copyright infringement.  The pertinent elements of the two works in issue bear enough

23   meaningful similarities – and there's enough in the way of likely extrinsic evidence on that

24   subject – that the Court should allow Plaintiff's copyright infringement claim to proceed.

25

26

27

28

IX.     **PLAINTIFF'S FIDUCIARY DUTY CLAIM SURVIVES REGARDLESS**

Defendants say that because Plaintiff's copyright infringement claim fails, so does his claim for breach of fiduciary duty.  But a viable copyright infringement claim is not a condition precedent to Plaintiff's breach of fiduciary duty claim.  Cf. *Benay*, at 629-30 (breach of implied-in-fact contract claim).

The act of copying alone – conceded for purposes of the present motions – would constitute an egregious breach of Defendant Alpert's fiduciary duty to Plaintiff, even if it were not technically actionable under copyright law. And as the SAC makes clear, there's more to the claim than that – for example, the use by Defendants of Plaintiff's biographical backstory notes, the failure to preserve confidential communications with Plaintiff regarding the development of DEAD AHEAD, as well as the failure to disclose to Plaintiff the conflict inherent in his business and creative involvement with the other defendants in FEAR THE WALKING DEAD.  So even if the copyright infringement claim isn't good, the breach of fiduciary duty claim is.  *Goodness Films v. TV One,* 2013 WL 12145508, at *2-3 (C.D. Cal. Feb. 28, 2013) (dismissing copyright infringement claim but sustaining breach of fiduciary duty and aiding and abetting claim because defendants misappropriated plaintiffs' property rights in their television series).

Plaintiff has alleged that Defendant Alpert was Plaintiff's agent representative for purposes of consulting with motion picture and television studios.  See SAC, at ¶ 24.  Defendant Alpert wrongfully deprived Plaintiff benefits from the use and exploitation of DEAD AHEAD, including the ideas embodied therein, and instead used DEAD AHEAD to enrich himself.  Id. at ¶ 39.

Defendant Kirkman, Defendant Alpert's long-time business partner, and co-founder of Image Comics, the original publisher of DEAD AHEAD, knew of his partner's fiduciary duty to Plaintiff.  Defendants Kirkman LLC, Circle of Confusion Productions LLC, New Circle of Confusion Productions LLC, and Skybound Productions, Inc. are all either owned or managed by Defendants Kirkman and Alpert, and knowledge of the fiduciary duty is imputed to those entities.  Id. at ¶¶ 10-12, 14-16.

1

Defendants AMC Networks, Inc., AMC Film Holdings, LLC, AMC Network

2

Entertainment LLC, AMC TV Studios, LLC, and Valhalla Entertainment, Inc. (collectively, the

3

"AMC Defendants") and their representatives worked closely and in concert with Defendants

4

Alpert and Kirkman to create FEAR THE WALKING DEAD.  Id. at ¶ 49.  David Erickson, the

5

AMC employee who served as FEAR THE WALKING DEAD's showrunner, worked closely in

6

the development, scripting, casting and production of FEAR THE WALKING DEAD and knew

7

of Defendant Alpert's relationship with and the services he was providing Plaintiff.  Id.  By

8

collaborating with him, as well as by providing personnel, resources and money, the AMC

9

Defendants provided Defendant Alpert with substantial material assistance in the breach his

10

fiduciary duty to Plaintiff.

11

As for the particulars of the who, what and when, those are matters exclusively within

12

Defendants' purview, and therefore impossible for Plaintiff to allege without discovery.

13

Consequently, the motions should be denied as to the breach of fiduciary duty and aiding and

14

abetting claims.

15

**X.     CONCLUSION**

16

For all the above reasons, the Court should deny Defendants' motions.  To the extent the

17

operative pleading requires further refinement to meet the Court's rulings on the current motions,

18

leave to amend should be granted.

19

20

Dated: November 30, 2018

21

  /s/ David M. Given

22

David M. Given
M. Jake Feaver

23

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

24

39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: 415-398-0900

25

26

Attorneys for Plaintiff

27

28